**UNITED STATE DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

**WILSON THEODORE,**
**LASHANDA THEODORE, and**
**STEVEN BILODEAU, JR.,**
*on behalf of themselves and others*
*similarly situated,*

     **Plaintiffs,**

**v.**         **Civil Action No. 4:25-cv-00045**

**EXPERIAN INFORMATION**
**SOLUTIONS, INC.,**     **JURY TRIAL DEMANDED**

     **Defendant.**

## CLASS ACTION COMPLAINT

   COME NOW the Plaintiffs, Wilson Theodore, Lashanda Theodore, and Steven Bilodeau, Jr., (collectively, the "Plaintiffs"), *individually and on behalf of others similarly situated,* by Counsel, hereby file this action against Defendant Experian Information Solutions, Inc. ("Defendant" or "Experian").

### PRELIMINARY STATEMENT

   1.  In this Court and Circuit, "CRAs [Consumer reporting agencies] cannot just report verbatim whatever is provided them by their sources; they must have procedures in place to ensure that the information from those sources is accurate." National Consumer Law Center, FAIR CREDIT REPORTING (10th ed. 2022), updated at www.nclc.org/library, §4.4.6.4.1 *CRAs must have procedures to monitor and oversee furnishers*.

   2.  Here, Defendant, a Big-3 CRA blindly accepted the reporting of loans fraudulently created by now bankrupt Power Home Solar, LLC d/b/a Pink Energy ("Pink Energy") and the closely connected lending partners that were used as the "furnishers" of credit reporting

information verbatim rereported by Experian in the credit reports of the Plaintiffs and many other consumers like them.

3.    The loans were created as a way to sell – usually door-to-door or by phone – supposed solar panel systems.  The systems were not genuine and are now the subject of a bankruptcy filed on October 7, 2022, in the Western District of North Carolina. The loans as well were grossly inflated and not such as to conform with ordinary consumer credit instruments more typically reported through Experian.

4.    Additionally, the loans that were created to finance these solar sales were themselves fraudulent and void.  For example, they each falsely stated the amount financed or principal and the interest owed and paid, usually in significant percentages.  The loans also falsely described their purpose and type.

5.    Numerous Attorneys General – including Virginia's own - sent letters to Pink Solar's lending partners demanding that those creditors and financial entities who work with Pink Energy as its financing side, including Sunlight Financial LLC ("Sunlight"), Dividend Solar Finance LLC, GoodLeap, LLC, ("Goodleap"), and Solar Mosaic, Inc. (collectively, the "Pink Energy Partners"), cease asserting those victimized consumers' fraudulent payment obligations.

6.    Experian was informed of all of this, and discovery will show it never once looked into it.  Nevertheless, Experian has allowed Sunlight and Goodleap and the other Pink Energy Partners to continue to report these debts on Plaintiffs' and putative class members' credit reports in order to coerce repayment of these Pink Energy based debts.

7.    Section 1681e(b) of the FCRA requires consumer reporting agencies to use "reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

8.      Further, §1681e(b) required at a minimum that the CRA include a notation that an account is disputed.

9.      Experian violated this provision as well as §1681i(a) which required it to conduct a substantive investigation when it received the Plaintiffs' disputes.

10.     This is a class action for statutory, actual, and punitive damages, costs and attorney fees, brought pursuant to the Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq. ("FCRA"). Defendant violated § 1681e(b) on a systemic basis by ignoring inconsistent information it received from consumer disputes, Attorneys General correspondence and public statements, and widespread press coverage of the Pink Energy accounts, and deferred instead to contradictory and unverified information reported by automated transmission from its paying subscribers, the Pink Energy partners. Experian also violated § 1681e(b) when it failed to delete or permanently block the reporting of the disputed Pink Energy Partner accounts when it knew they were disputed. Plaintiffs Theodore and Bilodeau also bring their own individual claims for actual, statutory and punitive damages for Experian's failure to properly investigate their disputes, as required by 15 U.S.C. § 1681i(a).

## JURISDICTION AND VENUE

10.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, 15 U.S.C. § 1681p, and 15 U.S.C. § 1692k(d).

11.     Venue is proper in this District and Division because Plaintiffs are residents of this District and Division, the violations described in this Complaint occurred in this District, a substantial part of the events giving rise to Plaintiffs' claims occurred in this Division, and Experian transacts business within this District and Division.

## PARTIES

12.     Plaintiffs Wilson Theodore, Lashanda Theodore, and Steven Bilodeau, Jr. are natural persons and "consumer[s]" as defined by § 1681a(c).

13.     Plaintiffs Wilson Theodore and Lashanda Theodore are residents of Hampton, Virginia.

14.     Plaintiff Steven Bilodeau, Jr. is a resident of Gloucester, Virginia.

15.     Defendant Experian Information Solutions, Inc. is a corporation headquartered in California and does business in the Commonwealth Virginia through its registered agent.

16.     Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f), and it disburses consumer reports to third parties for monetary compensation.

## FACTUAL ALLEGATIONS

**A.      The Statutory Background Regarding FCRA Claims.**

17.     Before the enactment of the FCRA, inaccurate and misleading information was identified as "the most serious problem in the credit reporting industry." 115 Cong. Rec. 2411 (Jan. 31, 1969). With this problem in mind, Congress enacted the FCRA in 1970 to ensure the "confidentiality, accuracy, relevancy, and proper utilization" of credit reports. 15 U.S.C. § 1681(b). This section imposes a high, and often disregarded, standard on consumer reporting agencies. *See, e.g., Burke v. Experian Info. Sols., Inc.*, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011) (breaking down the requirements of § 1681e(b), and explaining that "'assure' means 'to make sure or certain: put beyond all doubt,'" "'[m]aximum' means the 'greatest in quantity or highest degree attainable[,]' and 'possible' means something 'falling within the bounds of what may be done, occur or be conceived.'" (quoting *Webster's Third New International Dictionary* 133, 1396, 1771 (1993)).

18.    To accomplish Congress' goals, the FCRA contains a variety of requirements to protect consumers, including § 1681e(b), one of the cornerstone provisions of the FCRA. Whenever a consumer reporting agency prepares a consumer report, § 1681e(b) requires the CRAs like Experian to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates. 15 U.S.C. § 1681e(b).

19.    Experian is a consumer reporting agency and charged with using reasonable procedures designed to ensure the maximum possible accuracy of the information it reports. Experian fell short of that duty here, as it reported adverse, outdated, and inaccurate information related to Plaintiffs' accounts—that should have been deleted from Plaintiffs' credit files as required by the FCRA.

20.    The Consumer Financial Protection Bureau has noted, "experience indicates that [consumer reporting agencies] lack incentives and under-invest in accuracy." Consumer Fin. Prot. Bureau, Supervisory Highlights Consumer Reporting Special Edition 21 (Issue 14, March 2, 2017).

21.    Statutes like the FCRA therefore provide consumers with the only mechanism by which they can force consumer reporting agencies like Experian to report accurate information about them.

**B. Experian May Not Blindly Parrot its Source**

20.    The FCRA accuracy requirements for consumer reporting agencies, such as Experian, are primarily at 15 U.S.C. §§ 1681e(b) and 1681i(a).  Judge Trenga has explained the basic relationship and elements of these two sections:

> [C]ourts have found with respect to the initial collection of information that, absent reason to believe information from generally credible sources is inaccurate, a CRA is not required under Section 1681e(b) to go beyond its initial source of information to verify that information. See, e.g., *Henson v. CSC Credit Servs.*, 29 F.3d 280,

285–86 (7th Cir.1994) …. However, once the accuracy of information is actually challenged by a consumer, the sufficiency of a CRA's conduct relative to its duty of care will be evaluated under a "balancing test" that weighs the cost of verifying the accuracy of the information versus the possible harm of reporting inaccurate information, and this test becomes markedly more favorable to plaintiff's who have disputed the accuracy of the information in their credit reports. *See Johnson*, 357 F.3d at 432–33, citing with approval *Cushman v. Trans Union Corp.*, 115 F .3d 220, 225 (3d Cir.1997) (collecting cases and explaining that "[i]n short, when one goes from the § 1681e(b) investigation to the § 1681i(a) reinvestigation, the likelihood that the cost-benefit analysis will shift in favor of the consumer increases markedly."

*Burke* at *5. In shorter summary, the sections provide that a CRA is entitled to rely on the reporting of a "generally credible source" until the CRA is put on notice that the source or the information reported may be suspect. This analysis is repeated in the leading case law threads, which track from *Henson* and *Cushma*n.

21.     However, no furnisher is presumptively credible absent some basis. Even a bank or other financial institution is not deemed credible as a matter of law. Experian litigated this question in another parroting case in which the plaintiff sought in limine to exclude any evidence that the furnisher (Nationstar) was reliable. The trial court granted and denied the motion in part as the parties there had put into the record some evidence of the furnisher's reliability. However, beyond that, the court held: "In this regard, the Court is not persuaded by [Experian]'s argument that there is a 'presumption' in the law that financial institutions are reliable[.]" *Losch v. Experian Info. Sols., Inc.*, 2022 WL 17823664, at *8 (M.D. Fla. May 17, 2022).

22.     While information supplied by sources a CRA has reason to know are "generally credible" may be presumptively accurate, absent such presumption, the agency must initially investigate and research to ensure that the information the source will later report is maximally accurate. As this Court has explained:

While neither Section 1681e(b) nor 1681i(a)(1)(A) uses the term "investigation," it is clear from their explicit requirements that the obligation to conduct an investigation or reinvestigation that is reasonable under the circumstances is central to Experian's duty of care under the FRCA. This conclusion flows from the plain meaning of both sections. For example, Section 1681e(b) requires (1) "reasonable procedures" that (2) "assure" (3) "maximum possible accuracy." To "assure" means "to make sure or certain: put beyond all doubt." Webster's Third New International Dictionary 133 (1993). "Maximum" means the "greatest in quantity or highest degree attainable" and "possible" means something "falling within the bounds of what may be done, occur or be conceived ..." Id. at 1396, 1771. It is difficult to imagine how "maximum possible accuracy" could be guaranteed without an adequate investigation. Likewise, Section 1681i(a)(1)(A) requires a "reinvestigation," necessarily implying that an "investigation" was required to have been performed in the first instance.

*Burke* at *4.

23.     Experian does not follow any process or procedures to initially examine, audit, discuss, review or in any other way determine or measure the accuracy of the information any furnisher, including those at issue here, reports.

24.     Experian never investigates the credibility of its subscriber's reporting before litigation is filed by a consumer.

25.     After accepting a subscriber as a customer and source, Experian does not follow any process or procedures to thereafter examine, audit, discuss, review or in any other way determine or measure the accuracy of the information any furnisher, including those at issue here, reports.

26.     Experian does not follow any procedure or process to monitor or review publicly available information about a particular subscriber or reporting source.

27.     Further, even if Experian had known everything alleged in this Complaint about the subject subscribers, it still would not have changed anything and would still have continued to blindly parrot its paying customer sources.

C.          **Allegations Regarding the Class Claims for Violations of § 1681e(b)**

28.       Experian has allowed the reporting within Plaintiffs Wilson Theodore and Lashanda Theodore's (together, "Plaintiffs Theodore") credit reports of an account supposedly opened by and owed to: "CROSS RIVER BANK C/O SUNLIGHT FINANCIAL 1939." It was reported as a "Secured Home Improvement" account or loan.

29.       In fact, Plaintiffs Theodore do not have an account with or debt owed to any such furnisher. "Cross River Bank", while technically a "Community Bank" is actually just a fintech platform operated to allow non-bank companies to lend money to consumers without otherwise satisfying the requirements necessary to operate as a state or national bank. It has none of the indicia or structure of a business such as Bank of America, Wells Fargo or other assumed credible financial institutions.

30.       Experian has also allowed the reporting within Plaintiff Bilodeau's credit reports of an account supposedly opened by and owed to: "GOODLEAP LLC Partial Acct #200503…." It was reported as an "unsecured" account or loan.

31.       In fact, Plaintiff Bilodeau does not have an account with or debt owed to any such furnisher. "Goodleap LLC" formerly Loanpal is actually just a fintech platform operated to allow non-bank companies to lend money to consumers without otherwise satisfying the requirements necessary to operate as a state or national bank. It has none of the indicia or structure of a business such as Bank of America, Wells Fargo or other assumed credible financial institutions.

32.       Cross River and Goodleap have been publicly criticized in ways easily knowable by Experian.

33.       For example, the FDIC has slapped Cross River Bank with a consent order, accepted and stipulated as true by Cross Rover, because it engaged in unfair and deceptive

practices in violation of Section 5 of the Federal Trade Commission (FTC) Act and violated the Federal Consumer Credit Protection Act, 15 U.S.C. § 1600, et seq, statutes, in multiple ways. The order was issued in March 2023. https://orders.fdic.gov/sfc/servlet.shepherd/document/download/0693d000007xEStAAM?operationContext=S1.

34.    In fact, Cross River was required by that Consent Order to restrict or cease its allowance of its "Bank" label with non-Bank entities actually originating and handling the product.  ("The Bank will not (i) execute a binding commitment or agreement with a New Third Party; (ii) allow a New Third Party to offer a Credit product through, or in conjunction with the Bank; and/or (iii) offer a New CRB Credit Product, either directly or indirectly, without first receiving the Regional Director's written non-objection to do so.")

35.    Similarly, "Sunlight Financial" is not a traditional or presumptively credible lender or source of credit reporting.

36.    Sunlight Financial filed a reorganization bankruptcy and then emerged. .

37.    Plaintiffs do not have any loan obligation to either Cross River Bank, Sunlight, or Goodleap.  Experian's credit reports are thus factually inaccurate.

38.    Further, in the case of the Plaintiffs Theodore, Experian allowed its customer source to report this product as a "Secured Home Improvement Loan" using a corresponding Metro 2 reporting code.

39.    The loans for Plaintiffs and each putative class member also were materially different than the tradelines reported to Experian and republished. The fraudulent loans and Experian credit reporting materially inaccurately reported the principal amounts owing on these

loans. Such reporting was in each instance substantially greater than the principal actually owing on the loans.

40. None of the loans involving Plaintiffs Theodore reported to Experian by the fraud furnishers were in fact "Secured Home Improvement Loans." That term is intended by the industry-governing Credit Reporting Resource Guide and by common meaning within the trade and credit industry to mean that the loan is secured by real property. These supposed loans were never secured by real property.

41. This distinction is material as a reported mortgage lien on a consumer's real property conveys to third parties that the consumer does not have the means to obtain a real property mortgage and that their home is already encumbered.

42. These facts were readily apparent to Experian had it even investigated its furnisher-sources before agreeing to accept and blindly report factually inaccurate information about them.

43. The loans at issue in this case arise from a scheme designed by a now defunct and bankrupt company, Pink Energy, with Sunlight, Goodleap, and other associated scam lenders to use deceptive sales practices to defraud thousands of consumers into signing scam loans to pay tens of thousands of dollars each in connection with their supposed purchase of functional rooftop solar systems, while much of the money supposedly "financed" was itself just unearned financial charges and similar fees, kickback commissions to Pink Energy and other facially suspect and fraudulent components.

44. After many lawsuits were filed against Pink Energy, including by at least one Attorney General, and when it was under investigation of many more Attorneys General, it declared bankruptcy.

45.     In the interim, thousands of consumers like Plaintiffs have become the financial victims of Pink Energy's unlawful and deceptive sales practices as well as the unlawful scam financial structures and fees within these loans, now being on the hook for tens of thousands of dollars in loans for a sham product.

46.     The problem though was not that the Plaintiffs and similar consumers purchased defective products, but rather that they were victimized by a connected scheme between five lending partners and Pink Energy to attempt to separate the fraud from the loan instruments, with these Pink Energy lending partners conspiring and working with Pink Energy to inflate the loans, mislead consumers as to the actual "price" (known by everyone but the consumer to be false) and to circumvent federal and state consumer lending protections.

47.     When they discovered the interconnections between the lending partners and Pink Energy, the Virginia Attorney General and other Attorneys General notified each of these parties that the Pink Energy loans should be suspended and would not be lawfully enforced.

48.     The letter from the state Attorneys General Plaintiffs provided to Experian placed Experian on notice that the loans were—at best highly questionable, and at worst a complete sham, and Experian should have maintained reasonable procedures to ensure that it did not include any information pertaining to these loans in Plaintiffs' or the class members' reports.

49.     The Lending Partners received notice from the Attorneys General who wrote on behalf of their consumers - the putative class - to notify them that these Pink Energy accounts were disputed.

50.     Indeed, the Plaintiffs disputed with Experian that these debts were owed whatsoever and the accounts should be deleted from their credit files. They attached to their disputes to Experian the link to the October 7, 2022 joint letter from the Attorneys General of

Kentucky, North Carolina, Illinois, Indiana, Michigan, Pennsylvania, South Carolina, Tennessee and Virginia to the Pink Energy Partners in which the Attorneys General advised the Pink Energy Partners that Pink Energy was under investigation and/or litigation by them for suspected violations of their respective states' consumer protection laws as well as applicable federal statutes and regulations. The Attorneys General further demanded in their October 7, 2022 joint letter that the Pink Energy Partners "suspend loan payment obligations and the accrual of interest thereon…" and "work with consumers who have been adversely affected by Pink's bankruptcy and its alleged unlawful business practices."[1] Although Experian could have deleted the accounts in response to these disputes—a concession of the accuracy of their disputes—it nonetheless continued to report the same inaccurate information regarding other consumers as evidence by the reports of other putative class members.

51.    Despite the widely known and publicized statements for the aforementioned Attorneys General, Experian nonetheless chose to allow the Pink Energy Partners, such as Sunlight and Goodleap, to inaccurately report balances owed on these bogus loans which debts were not just disputed by consumers, but were backed by numerous state government officers.

52.    Any argument that the notice text or information stated within the AG publications or consumer dispute letters about the fraudulent reported "loans" did not contain all of the detail or fraud facts stated herein is disingenuous and immaterial as Experian still accepts and continues to report the same accounts from the same customers with no change whatsoever even after this lawsuit.

---

[1] https://www.attorneygeneral.gov/wp-content/uploads/2022/11/Multistate-Letter-To-Solar-Lenders-signatures-attached-v.-2.pdf (last accessed: August 25, 2023).

53.     This conduct violated the FCRA, which required Experian to use "reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report related." 15 U.S.C. § 1681e(b). Plaintiffs are not alleging that the Defendant was required to know about the content, communications or personal fraud items within each transaction, but rather that it had a duty to investigate to determine whether its customer sources themselves were generally credible, such to be permitted to report data within the highly-regulated credit files and reports at Experian.  The scams and fraud that occurred with respect to the Plaintiffs and similarly situated consumers was inevitable, foreseeable and abetted by Experian's total failure to vet, audit, research and investigate whether such companies were legitimate.

### D.    Allegations Regarding the Class Claims for Violations of § 1681e(b) for Failure to Report Dispute

54.     The Compliance Condition Code ("CCC") field within a reported credit tradeline is the manner of reporting that CRAs like Experian instruct their furnisher subscribers to use to note an account as disputed.

55.     There is no other manner of reporting an active account as disputed that can cause the adverse account to be suppressed in a consumer's credit score.

56.     To comply with a different FCRA section, § 1681i(c), allows a consumer to add a "100-word statement" to a credit report. Experian will add such free text in a report generally, but does not do so as to a specific credit account and within that credit account's tradeline.  And it will not even add this notation unless the consumer uses specific exact words requesting it.

57.     Further, Experian does not code a consumer's 100-word statement within a manner that allows it to be integrated within a consumer's credit score.

58.     Because nearly all of Experian's subscribers who buy and use credit reports receive, decode and format Experian's credit reports in an electronic format, a freeform consumer statement is entirely useless and is ignored by every major lender in considering a consumer's credit application.

59.     Nevertheless, Experian as a blanket and uniform policy does not allow its agents, employees and systems to add a missing CCC when it learns that the consumer disputes the furnisher's reporting.

60.     In fact, since numerous courts – including this one - have held that the omission of certain CCC codes violates the FCRA, Experian has tried to redefine and change the instructions for using such required code to prevent the reporting of an account is in active dispute and to prevent its suppression from a consumer's credit score.

61.     Indeed, the Fourth Circuit recently stated:

> [I]f an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly—(1) modify that item of information; (ii) delete that item of information; or (iii) permanently block the reporting of that item of information.

*Guthrie v. PHH Mortgage Corporation,* 79 F.4th 328, 344 (4th Cir. 2023) (quoting 15 U.S.C. § 1681s-2(b)(1)) .

62.     The facts in this case illustrate this problem. While the FCRA requires the reporting of an accurate – both technically accurate and complete - status of dispute in a credit account, furnishers such as Sunlight, Goodleap, and other Pink Energy Partners fail to use the CCC code for disputed account and Experian knowingly refuses to note such an account as disputed.

63.     Reporting of an account as undisputed when Experian knows it is in fact disputed is not maximally accurate and is unreasonable.

E.    **Plaintiffs Wilson Theodore and Lashanda Theodore' Additional Experiences**

64.    Within the past two years, Experian allowed Sunlight to report adverse and inaccurate information about Plaintiffs Wilson Theodore and Lashanda Theodore.

65.    In particular, Experian allowed Sunlight to report that Plaintiffs Theodore were seriously past due on a loan serviced by Sunlight, including a past due amount of $64,864.

66.    Experian allowed Sunlight's reporting to be added to Plaintiffs Theodore's credit files, even though it knew or should have known that the debt was disputed.

67.    Mr. and Mrs. Theodore disputed the Sunlight account with Experian in April 2023 via Certified Mail requesting that Experian delete the Sunlight account from their credit files.

68.    In response to Mr. and Mrs. Theodore's disputes, Experian failed to conduct any investigation of her dispute. Instead, it relied entirely on Sunlight to investigate the dispute and once Sunlight verified the information it was already reporting, Experian took no additional steps to investigate or make sure that the information that Sunlight provided was actually correct.

69.    Additionally, Experian took no steps itself to permanently block credit reporting or delete the disputed tradeline from Plaintiffs' credit files.

70.    Furthermore, Experian did not take the minimal measure of including a notation or remark that the account was disputed by Mr. and Mrs. Theodore.

71.    As a result, the inaccurate information regarding the Sunlight account remained on Mr. and Mrs. Theodore's credit files.

72.    To be clear, this information should not have appeared in Mr. and Mrs. Theodore's credit reports after the Plaintiffs, who were backed by numerous Attorneys General, disputed the debt.

73.     Because of this inaccurate reporting, Mr. and Mrs. Theodore would not be able to demonstrate the invalidity of this account to a creditor.

74.     Both Mr. and Mrs. Theodore experienced significant credit harm as a result.

**F.    Plaintiff Steven Bilodeau, Jr.'s Experience**

75.     Within the past two years, Experian allowed Goodleap to report adverse information about Plaintiff Steven Bilodeau, Jr. ("Mr. Bilodeau" or "Plaintiff Bilodeau").

76.     In particular, Experian allowed Goodleap to report that Mr. Bilodeau was seriously past due on a loan serviced by Goodleap, including a past due amount of $85,384.

77.     Experian allowed Goodleap's reporting to be added to Mr. Bilodeau's credit files, even though it knew or should have known that the debt was disputed as part of an ongoing investigation by several Attorneys General.

78.     Mr. Bilodeau disputed the Goodleap account with Experian in April 2024 via Certified Mail requesting that Experian delete the Goodleap account from his credit files.

79.     A Certified Mail receipt shows that Experian signed for Mr. Bilodeau's disputes on April 12, 2024.

80.     On May 2, 2024, Experian forward to Mr. Bilodeau the results of its reinvestigation of Plaintiff Bilodeau's dispute, verifying the Goodleap account was past due and owing for $85,384.

81.     Mr. Bilodeau alleges that Experian wholly ignored their disputes; or alternatively, Experian failed to conduct a substantive investigation of their disputes and instead relied entirely on Goodleap to investigate Plaintiff Bilodeau's disputes and once Goodleap verified the information it was already reporting, Experian took no additional steps to investigate or make sure that the information that Goodleap provided was actually correct.

82.     Additionally, Experian took no steps itself to permanently block credit reporting or delete the disputed tradeline from Mr. Bilodeau's credit files.

83.     Furthermore, Experian did not take the minimal measure of including a notation or remark that the account was disputed by Mr. Bilodeau.

84.     As a result, the inaccurate information regarding the Goodleap account remained on Mr. Bilodeau's credit files.

85.     To be clear, this information should not have appeared in Mr. Bilodeau's credit reports after Plaintiff Bilodeau, who was backed by numerous Attorneys General, disputed the debt.

86.     Because of this inaccurate reporting, Mr. Bilodeau would not be able to demonstrate the invalidity of this account to a creditor.

87.     Mr. Bilodeau experienced significant credit harm as a result.

**G.    Experian's Violations Were Willful.**

88.     Experian's reporting of the Pink Energy Partner accounts and processing of consumer disputes was willful and carried out in reckless disregard for the consumers' rights under the FCRA. Experian's conduct was willful because it was accomplished through intended procedures that prioritize its own profitability over accuracy.

89.     In addition, the willful nature of Experian's FCRA violations can be established by, for example:

    a.  The FCRA was enacted in 1970; Experian has had 53 years to become compliant;

    b.  Experian is a large company with access to legal advice through its own general counsel's office and/or outside litigation counsel. Yet, there is no contemporaneous evidence that it determined that its conduct was lawful;

   c.   Experian knew or had reason to know that its conduct was inconsistent with numerous Attorneys General's guidance, case law, and the plain language of the FCRA;

   d.   Experian voluntarily ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless; and

   e.   Experian's violations of the FCRA were repeated and systemic.

## CLAIMS FOR RELIEF

### COUNT ONE:
### VIOLATION OF THE FCRA, 15 U.S.C. § 1681e(b)
### (Class Claim)

90.    Plaintiffs incorporate by reference each of the allegations set forth in the preceding paragraphs.

91.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as:

> **1681e(b) Class:** All persons residing in the United States (1) for whom Experian furnished a consumer report; (2) on or after January 1, 2023; and (3) containing an account where the original creditor of the loan was one of the Pink Energy Partners; and (4) the account pertains to a consumer's purchase of products and/or equipment from Pink Energy.

> Excluded from the sub-class definition are any employees, officers, directors of Defendant, any attorney appearing in this case, any person employed by the Federal Judiciary, and all persons who have signed a written release of his or her claim.

92.    Plaintiffs are all members of the 1681e(b) Class.

93.    **Numerosity. FED. R. CIV. P. 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all their claims is impractical. The class members' names and addresses are identifiable through Experian's internal business records, and they may be notified of the pendency of this action by published and/or mailed notice.

94.     **Predominance of Common Questions of Law and Fact.** FED. R. CIV. P. 23(a)(2). Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include (1) whether Experian's conduct violated § 1681e(b) by reporting information related to Pink Energy Partners' accounts after Experian's receipt of consumer disputes backed by numerous State Attorneys General; (2) whether Experian maintained reasonable procedures designed to avoid violations of § 1681e(b); (3) whether Experian's conduct was willful or negligent violation; and (4) the appropriate amount of damages to be awarded to each consumer.

95.     **Typicality.** FED. R. CIV. P. 23(a)(3). Plaintiffs' claims are typical of the claims of each putative class member. Plaintiffs are entitled to relief under the same causes of action as the other putative class members. Additionally, Plaintiffs' claims are based on the same facts and legal theories as each of the class members' claims.

96.     **Adequacy of Representation.** FED. R. CIV. P. 23(a)(4). Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the other putative class members. Plaintiffs have retained counsel competent and experienced in such litigation and intends, with their counsel, to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the class members' interests. Neither Plaintiffs nor their counsel have any interest that might conflict with their vigorous pursuit of this action.

97.     **Superiority.** FED. R. CIV. P. 23(b)(3). Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each class member are such that individual prosecution would prove

burdensome and expensive. It would be virtually impossible for individual class members to effectively redress the wrongs done to them. Even if the class members could afford individual litigation, it would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Experian's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

98.     As described above, Experian violated § 1681e(b) of the FCRA by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning the Plaintiffs.

99.     Plaintiffs and each putative class member suffered real and actual harm and injury.

100.    For example, the rights at issue were determined by Congress to be important measures to ensure continued accuracy and completeness in Experian's files and reports.

101.    In each instance, each class member's credit report contained derogatory information that Experian was legally obligated to remove or permanently block the reporting thereof.

102.    Experian's conduct was willful, rendering it liable for statutory and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, the violation was negligent, rendering Experian liable under 15 U.S.C. § 1681o.

103.    As a result of these FCRA violations, Experian is liable for statutory damages from $100.00 to $1,000.00 for Plaintiffs and each class member, punitive damages, attorney's fees, and costs pursuant to 15 U.S.C. § 1681n.

## COUNT TWO:
## VIOLATION OF THE FCRA, 15 U.S.C. § 1681i(a)
### (Individual Claims)

104.    Plaintiffs Theodore made disputes to Experian during the two years preceding the filing of this action about the inaccurate reporting of the Sunlight account; and Plaintiff Bilodeau made one or more disputes to Experian during the two years preceding the filing of this action about the inaccurate reporting of the Goodleap account.

105.    In each instance, Experian refused to conduct any meaningful or reasonable investigation and instead relied entirely on its parroting of its paying customers – Sunlight and Goodleap.

106.    Experian violated 15 U.S.C. § 1681i(a)(1) by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate.

107.    Experian violated 15 U.S.C. § 1681i(a)(4) by its conduct which includes, but is not limited to, failing to review and consider all relevant information that it received with the Plaintiffs' disputes.

108.    Further, not only did Experian not permanently block or delete the disputed Sunlight and Goodleap tradelines with regard to Plaintiffs Theodore and Plaintiff Bilodeau, respectively, but it also intentionally refused to note the account reporting as in dispute.

109.    Experian thus violated 15 U.S.C. § 1681i(a)(5) by its conduct which includes, but is not limited to, failing to delete or modify any information that was the subject of the Plaintiffs' disputes and that was inaccurate or could not be verified.

110.    The Plaintiffs have been prevented and deterred from securing credit that they should have otherwise qualified for due to the inaccurate information that Experian has continued to include within their files, directly and as well without reporting it as disputed.

111.   As a result of Experian's conduct, actions, and inaction, the Plaintiffs suffered damages to include, but not limited to damage to their credit rating, increased costs and interest, aggravation, emotional stress, inconvenience, embarrassment, and frustration.

112.   As a result of Experian's conduct, actions, and inaction, the Plaintiffs suffered actual damages.

113.   Experian's violations were willful, pursuant to 15 U.S.C. § 1681n, or, in the alternative, negligent entitling the Plaintiffs to recover under 15 U.S.C. § 1681o.

114.   As a result of Experian's violation of 15 U.S.C § 1681i(a), the Plaintiffs are entitled to recover actual, statutory, and punitive damages, in addition to their costs and attorney fees.

**WHEREFORE**, the Plaintiffs request certification of the class pursuant to Fed. R. Civ. P. 23(b); demands judgment on liability finding that Defendant willfully, or in the alternative negligently, violated 15 U.S.C. §§ 1681e(b) and 1681i(a); demands judgment for actual, statutory and punitive damages against the Defendant, for attorneys' fees and costs, for prejudgment and postjudgment at the legal rate, and such other relief the Court deems appropriate.

**TRIAL BY JURY IS DEMANDED.**

April 30, 2025

Respectfully Submitted,
**WILSON THEODORE and
LASHANDA THEODORE**

By:    */s/ Leonard A. Bennett*
Leonard A. Bennett, VSB #37523
Thomas Domonoske, VSB #35434
Mark C. Leffler, VSB #40712
Adam W. Short, VSB #98844
John Maravalli, VSB #99000
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Ste. 1-A

Newport News, Virginia 23601
Telephone: (757) 930-3660
Fax: (757) 930-3662
Email: tom@clalegal.com
Email: lenbennett@clalegal.com
Email: adam@clalegal.com
Email: john@clalegal.com

Kristi C. Kelly, VSB #72791
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167
Email: kkelly@kellyguzzo.com
*Counsel for Plaintiffs*