**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

| | |
|---|---|
| **WILSON THEODORE, et al.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**EXPERIAN INFORMATION SOLUTIONS, INC.,**<br><br>**Defendant.** | **Civil Action No. 4:25-cv-00045-EWH-LRL** |

# MEMORANDUM OF LAW IN SUPPORT OF EXPERIAN INFORMATION SOLUTIONS, INC.'S MOTION TO COMPEL ARBITRATION

**INTRODUCTION**

This is a putative class action under the Fair Credit Reporting Act ("FCRA"). The plaintiffs, Wilson Theodore, Lashanda Theodore, Steven Bilodeau, Raymond Smith, Wilton Wahlkamp, Susan Hudspeth, and Jason Settle (collectively, "Plaintiffs" and, when referred to individually, "Plaintiff") allege that defendant Experian Information Solutions, Inc. ("EIS") violated the FCRA by reporting allegedly inaccurate information. Pursuant to Plaintiffs' written agreements, EIS elects to adjudicate Plaintiffs' claims in arbitration.

The outcome of this motion is controlled by the Fourth Circuit's recent decision in *Austin v. Experian Info. Sols., Inc.*, 148 F.4th 194 (4th Cir. Aug. 1. 2025), which reversed the denial of the district court's order denying EIS's motion to compel arbitration under the same contract at issue here. *Austin* does not stand alone. It is in accord with the Eleventh Circuit's recent decisions in *Lamonaco v. Experian Info. Sols., Inc.*, 141 F.4th 1343 (11th Cir. 2025), *Newton v. Experian Info. Sols., Inc.*, 2025 WL 2102084 (11th Cir. July 28, 2025), as well as the Ninth Circuit's decision in *Meeks v. Experian Info. Sols. Inc.*, 2022 WL 17958634 (9th Cir. Dec. 27, 2022). *Austin* also is in accord with the following other directly on-point authorities: *Jenkins v. Experian Info. Sols. Inc.*, 2024 WL 4100258 (E.D. Va. Sept. 6, 2024) (Giles, J.), *Wells v. Experian Info. Sols., Inc.*, 2025 WL 475846 (E.D. Va. Feb. 12, 2025) (Young, J.), *Aguiar v. Experian Info. Sols., Inc.*, 2025 WL 1531433 (E.D. Cal. May 29, 2025), *Penn v. Experian Info. Sols., Inc.*, 2025 WL 1427440 (C.D. Cal. May 6, 2025), *Borukh v. Experian Info. Sols., Inc.*, 2025 WL 1220042 (E.D.N.Y. Apr. 28, 2025), *Oestreicher v. Equifax Info. Servs., LLC*, 2024 WL 1199902 (E.D.N.Y. Mar. 20, 2024), *Alvarez v. Experian Info. Sols. Inc.*, 2023 WL 2519249 (E.D.N.Y. Mar. 15, 2023), *Cimillo v. Experian Info. Sols. Inc.*, 2023 WL 2473403 (S.D.N.Y. Mar. 13, 2023), *Levy v. Experian Info. Sols. Inc.*, 2023 WL 2644352 (S.D.N.Y. Mar. 27, 2023), *Rubio v. Experian Information Solutions,*

*Inc.*, 2025 WL 2172207 (E.D. Cal. July 31, 2025), *Bryant v. Experian Info. Sols., Inc.*, 2025 WL 313204 (C.D. Cal. Jan. 27, 2025), *Walker v. Experian Info. Sols., Inc.*, 2025 WL 1584680 (E.D. Ky. June 4, 2025), *Aguiar v. Experian Info. Sols., Inc.*, 2025 WL 1531433 (E.D. Cal. May 29, 2025), *Browning v. Experian Info. Sols., Inc.*, 2025 WL 1503973 (S.D. Ind. May 25, 2025), *Lawrence v. Experian Info. Sols., Inc.*, 2025 WL 1431272 (N.D. Ga. May 15, 2025), *Nirandone v. Experian Info. Sols., Inc.*, 2025 WL 1427452 (D. R.I. May 13, 2025), *Penn v. Experian Info. Sols., Inc.*, 2025 WL 1427440 (C.D. Cal. May 6, 2025), *Dicandia v. Experian Info. Sols., Inc.*, 2025 WL 903629 (M.D. Fla. Mar. 25, 2025), *Martin v. Experian Info. Sols. Inc.*, 2025 WL 729274 (M.D. Fla. Mar. 5, 2025), *Wells v. Experian Info. Sols., Inc.*, 2025 WL 475846 (E.D. Va. Feb. 12, 2025), *Goldsberry v. Experian Info. Sols., Inc.*, 2025 WL 699357 (E.D. Tex. Feb. 10, 2025), *Bryant v. Experian Info. Sols., Inc.*, 2025 WL 313204 (C.D. Cal. Jan. 27, 2025), *Hunt v. Experian Info. Sols. Inc.*, 2025 WL 104324 (M.D. Ga. Jan. 15, 2025), *Ellis v. Experian Info. Sols. Inc.*, 2025 WL 79637 (M.D. Fla. Jan. 13, 2025), *Jones v. Experian Info. Sols., Inc.*, 2025 WL 227198 (D. Minn. January 7, 2025), *Humphrey v. Experian Info. Sols., Inc.*, 2024 WL 5247164 (N.D. Ala. Dec. 30, 2024), *Acorin v. Experian Info. Sols., Inc.*, 2024 WL 5011950 (S.D. Cal. Dec. 6, 2024), *Oatway v. Experian Info. Sols., Inc.*, 2024 WL 4879822 (W.D. Wash. Nov. 25, 2024), *Buchanan v. Experian Info. Sols., Inc.*, 2024 WL 4817129 (W.D. Pa. Nov. 18, 2024), *Williams v. Experian Info. Sols., Inc.*, 2024 WL 3876171 (D. Ariz. Aug. 20, 2024), *Driskill v. Experian Info. Sols. Inc.*, 2024 WL 4453292 (N.D. Cal. Oct. 8, 2024), *Rangel v. Experian Info. Sols. Inc.*, 2024 WL 4203361 (E.D. Cal. Sept. 16, 2024), *Clark v. Experian Info. Sols. Inc.*, 2024 WL 4044130 (E.D. Cal. Sept. 4, 2024), *Taylor v. Experian Info. Sols., Inc.*, 2024 WL 5265371 (N.D. Ga. Dec. 31, 2024), *Scribner v. Trans Union LLC*, 2024 WL 3274838 (E.D. Cal. July 2, 2024), *Baker v. Experian Info. Sols. Inc.*, 2024 WL 3082644 (S.D. Ind. June 20, 2024), *George v. Experian Info. Sols. Inc.*, 2024

WL 3013146 (D. Md. June 14, 2024); *Hanson v. Experian Info. Sols. Inc.*, 2024 WL 2974160 (N.D. Ga. June 12, 2024); *Myers v. Experian Info. Sols. Inc*., 2024 WL 2278398 (D. Ariz. May 20, 2024); *Garcia v. Experian Info. Sols. Inc.*, 2024 WL 1117912 (N.D. Cal. Mar. 13, 2024); *Pecoraro v. Experian Info. Sols. Inc.*, 2023 WL 8525114 (S.D. Fla. Dec. 6, 2023), *Ferrell v. Experian Info. Sols. Inc.*, 2024 WL 158103 (C.D. Cal. Jan. 11, 2024), *McLees v. Experian Info. Sols. Inc.*, 2024 WL 135940 (C.D. Cal. Jan. 11, 2024), *Evans v. Experian Info. Sols. Inc.*, 2023 WL 4714078 (C.D. Cal. July 21, 2023), *Knott v. Equifax Info. Servs., LLC*, 2023 WL 6940289 (N.D. Ga. Sept. 7, 2023), *Yates v. Experian Info. Sols. Inc.*, 2023 WL 4747386 (S.D. Tex. July 25, 2023), accepting Report and Recommendations in 2023 WL 5279467 (S.D. Tex. Aug. 16, 2023), *Johnson v. Southwest Recovery Services, Inc.*, 2023 WL 1879999 (N.D. Tex. Feb. 10, 2023), accepting Report and Recommendations in 2023 WL 1944127 (N.D. Tex. Jan. 24, 2023)), *Roberson v. Experian Information Solutions, Inc.*, 2022 WL 62270 (W.D. Tex. Jan. 5, 2022), *Sauer v. Experian Info. Sols. Inc.*, 2022 WL 2163016 (C.D. Cal. May 12, 2022), *Solis v. Experian Info. Sols., Inc.*, 629 F. Supp. 3d 1016 (C.D. Cal. 2022), *DeVries v. Experian Info. Sols. Inc.*, 2017 WL 733096 (N.D. Cal. Feb. 24, 2017), *Saucedo v. Experian Info. Sols. Inc.*, 2023 WL 4708015 (E.D. Cal. July 24, 2023), *Capps v. Experian Info. Sols. Inc.*, 2023 WL 3030990 (E.D. Cal. Apr. 21, 2023), *Pipoly v. Experian Info. Sols. Inc.*, 2023 WL 5184188 (N.D. Ga. Aug. 2, 2023), report and recommendation adopted, 2023 WL 5438171 (N.D. Ga. Aug. 21, 2023), *Abukar v. Experian Info. Sols. Inc.*, 2023 WL 3394827 (E.D. Wis. Apr. 11, 2023), *Arciniega v. Experian Info. Sols. Inc.*, 2023 WL 6803084 (D. Ariz. Oct. 12, 2023), *Smith v. Experian Info. Sols. Inc.*, 2023 WL 6057377 (D. N.J. Sept. 14, 2023), *Kinkle v. Experian Info. Sols. Inc.*, 2023 WL 4105804 (S.D. Ind. June 21, 2023), *Solis v. Experian Info. Sols. Inc.*, 2023 WL 4474322 (M.D. Fla. July 11, 2023), *Morgan v. Experian Info. Sols. Inc.*, 2022 WL 681359 (W.D. Wash. Mar. 4, 2022), *Stephens v. Experian Info. Sols. Inc.*, 614 F. Supp.

3d 735 (D. Haw. 2022), *Coulter v Experian Info. Sols. Inc.*, 2021 WL 735726 (E.D. Pa. Feb. 25, 2021), and *Tadic v. Experian Info. Sols. Inc.*, 2019 WL 11499103 (N.D. Ga. Mar. 13, 2019).

Like the plaintiffs in the above-cited cases, Plaintiffs are members of CreditWorks, the name of Experian's credit monitoring service provided by EIS's affiliate, ConsumerInfo.com, Inc. ("CIC") (which does business as Experian Consumer Services ("ECS")). As in those cases, Plaintiffs' memberships in CreditWorks predates the filing of this lawsuit. There, like here, when Plaintiffs enrolled in CreditWorks, they too agreed to the Terms of Use governing that service. That contract contains an Arbitration Agreement. The Arbitration Agreement defines "ECS" to include its "affiliates." At all times relevant to this action, EIS has been an affiliate of ECS, as courts consistently have found. *See, e.g.*, *Cimillo*, 2023 WL 2473403, at *5 n.7 ("[N]umerous courts considering the same or similar agreements involving EIS have found EIS is properly considered an affiliate under the same or similar Arbitration Agreements.").

The Arbitration Agreement provides that Plaintiffs and "ECS"—which, again, is defined under the contract to include its affiliate, EIS—agreed to arbitrate "all disputes and claims between us" that arise out of, or relate to, their agreement. As court-after-court has confirmed, as a party to the Arbitration Agreement contained therein (by virtue of how ECS is defined under the contract), EIS may directly enforce the arbitration provision. *See Levy*, 2023 WL 2644352, at *6-7 ("[T]he Court agrees with Defendant [EIS] that it is an affiliate of ECS and a party to the contract."); *Meeks*, 2022 WL 17958634, at *2 (same); *Cimillo*, 2023 WL 2473403, at *5 (same); *Alvarez*, 2023 WL 2519249, at *6 (same); *Roberson*, 2022 WL 62270, at *2 (same); *Stephens*, 2022 WL 2716177, at *1 (same). At a minimum, however, EIS is a third-party beneficiary of the contract. *Alvarez*, 2023 WL 2519249, at *6 ("Even if [EIS] could not enforce the Arbitration Agreement as a party, under a third-party beneficiary theory, [EIS] may do so.").

The Arbitration Agreement in the Terms of Use delegates "all issues" to an arbitrator, including all questions regarding arbitrability, enforceability and scope. *Aguiar*, 2025 WL 1531433, at *6 (holding same). The contract also expressly incorporates the AAA rules. Thus, if there is any dispute as to the arbitrability of Plaintiffs' claims, an arbitrator is to resolve such issues. *See, e.g.*, *Levy*, 2023 WL 2644352, at *9 (finding that the delegation clause and incorporation of the AAA Rules shows "the clear and unmistakable intent of the Parties to submit arbitrability determinations to the arbitrator"); *Brenco Enterprises, Inc. v. Bitesquad.com, LLC*, 297 F. Supp. 3d 608, 612 (E.D. Va. 2018) (Ellis, J.) (characterizing the incorporation of the AAA rules as "'clear and unmistakable'" and accordingly found "there is no doubt that the Agreement's arbitration clause manifests the parties' clear intention to commit the arbitrability determination to the arbitrator"). And, while some of the Plaintiffs have cancelled their CreditWorks memberships, the contract expressly provides that the Arbitration Agreement applies to "claims that may arise after the termination of this Agreement."

Thus, under the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.*, EIS respectfully moves for an order compelling this matter to arbitration, as required under Plaintiffs' written agreement, and staying this action until arbitration has been completed.

## STATEMENT OF FACTS

Because there are seven named plaintiffs—each of whom enrolled in CreditWorks at different times—EIS will discuss the enrollment process for each of them.

### I. FACTS PERTAINING TO WILSON THEODORE'S MEMBERSHIP

On June 5, 2020, Plaintiff enrolled in CreditWorks. *See* **Exhibit A**, Declaration of Dan Smith ("Smith Decl."), ¶ 3. In order to successfully enroll, Plaintiff had to complete a single webform. *Id*. The form required Plaintiff to enter his personal information—*e.g.*, his name, address,

phone number, and e-mail address—and create a password. *Id*. After he entered his personal information and a password, Plaintiff had to click the "Create Your Account" button on the webform in order to enroll. *Id*. Below the boxes to enter his e-mail address and password was the following disclosure: "By clicking 'Create Your Account': I accept and agree to your Terms of Use Agreement, as well as acknowledge receipt of your Privacy Policy." *Id*. A true and correct representation of the webform as it would have appeared when Plaintiff enrolled in CreditWorks is attached as Exhibit 1 to the Smith Declaration.

The phrase "**Terms of Use Agreement**" in the disclosure was off set in bold blue text and, if clicked, would have presented the consumer with the full text of the agreement. *Id*., ¶ 4. That is, the phrase "Terms of Use Agreement" in the disclosure was a full text hyperlink to the Terms of Use. *Id*. Thus, before clicking the "Create Your Account" button, the consumer could view the entire text of the Terms of Use Agreement by clicking on the blue-highlighted hyperlink "Terms of Use Agreement." *Id*. When a consumer clicked on the "Terms of Use Agreement" hyperlink, an overlay modal would open within the consumer's web browser containing the entire text of the Terms of Use Agreement. *Id*. Below the disclosure was a large purple button that read: "Create Your Account." *Id*. The webform, the disclosure, and the "Create Your Account" button appeared on a single webpage. *Id*.

After entering his information, Plaintiff clicked the "Create Your Account" button, thereby accepting and agreeing to the Terms of Use Agreement. *Id*., ¶ 5. Plaintiff would not have been able to successfully enroll in CreditWorks unless he clicked that button. *Id*. A true and correct copy of the Terms of Use that was in effect when Plaintiff enrolled in CreditWorks is attached as Exhibit 2 to the Smith Declaration. *Id*. After enrolling, Plaintiff continued to use the service, including after the version of the Terms of Use in effect at the time he filed this lawsuit came into effect. *Id*. A

true and correct copy of the Terms of Use that was in effect at the time that Plaintiff filed this lawsuit is attached as Exhibit 3 to the Smith Declaration.

Terms of Use contains an Arbitration Agreement, which requires him to arbitrate, among other things, all claims against "ECS" that "relate to" or "arise out of" his membership. *Id*., ¶ 6. The Arbitration Agreement defines "ECS" to include its "affiliates" *Id*. During the entire time that Plaintiff has been enrolled in CreditWorks, EIS has been an affiliate of ECS. *Id*. By including EIS (an affiliate) within the definition of "ECS," the Terms of Use make EIS a party to the contract, as well as a party to the Arbitration Agreement contained within the contract. *Id*. Moreover, by including EIS within the "Overview and Acceptance of Terms" section, as well as within the definition of ECS in the Arbitration Agreement, the parties intended for EIS to benefit under the contract. Additionally, the Arbitration Agreement incorporates the AAA rules. *Id*.

Every version of the Terms of Use Agreement in effect during Plaintiff's enrollment has a section entitled, "Amendments," which advised him that he would be bound by the then-current Terms of Use each time he "order[ed], access[ed], or use[d]" any of the Services or Websites described in the agreement: "Each time you order, access or use any of the Services or Websites, you signify your acceptance and agreement, without limitation or qualification, to be bound by the then current Agreement." *Id*., ¶ 7. ECS provided Plaintiff with written e-mail notice of the Arbitration Agreement in the current version of the Terms of Use, and thereafter, Plaintiff continued to use the CreditWorks service, thereby accepting the amended Terms of Use in the manner called out in the contract. *Id*.

## II. <u>FACTS PERTAINING TO LASHANDA THEODORE'S MEMBERSHIP</u>

On June 27, 2018, Plaintiff enrolled in CreditWorks. *See* Smith Decl., ¶ 8. In order to successfully enroll, Plaintiff had to complete two webforms. *Id*. The first form required Plaintiff

to enter her personal information—*e.g.*, her name, address, phone number, and e-mail address. *Id*. After she did so, Plaintiff had to click the "Submit and Continue" button on the form to continue with the enrollment process. *Id*. A true and correct representation of the first webform as it would have appeared when Plaintiff enrolled in CreditWorks is attached as Exhibit 4 to the Smith Declaration. *Id*. Plaintiff clicked the "Submit and Continue" button and was presented with a second form to complete. *Id.* Plaintiff would not have been able to successfully enroll in CreditWorks unless she clicked that button. *Id*.

The second webform required Plaintiff to enter her social security number, date of birth, and a username and password. *Id.* Immediately below the boxes to enter and confirm her password, was the following disclosure: "By clicking "Submit Secure Order": I accept and agree to your Terms of Use Agreement, as well as acknowledge receipt of your Privacy Policy and Ad Targeting Policy." *Id*. A true and correct representation of the webform as it would have appeared when Plaintiff enrolled in CreditWorks is attached as Exhibit 5 to the Smith Declaration. *Id*.

The phrase "**Terms of Use Agreement**" in the disclosure above was off set in bold blue text and, if clicked, would have presented the consumer with the full text of the agreement. *Id*., ¶ 9. That is, the phrase "Terms of Use Agreement" in the disclosure was a full text hyperlink to the Terms of Use. *Id*. Thus, before clicking the "Submit Secure Order" button, the consumer could view the entire text of the Terms of Use Agreement by clicking on the blue-highlighted hyperlink "Terms of Use Agreement." *Id*. When a consumer clicked on the "Terms of Use Agreement" hyperlink, an overlay modal would open within the consumer's web browser containing the entire text of the Terms of Use Agreement. *Id*. Immediately below the disclosure was a large purple button that reads: "Submit Secure Order." *Id*. The webform, the disclosure, and the "Submit Secure Order" button appeared on a single webpage. *Id*.

After entering her information, Plaintiff clicked the "Submit Secure Order" button, thereby accepting and agreeing to the Terms of Use Agreement. *Id*., ¶ 10. Plaintiff would not have been able to successfully enroll in CreditWorks unless she clicked that button. *Id*. A true and correct copy of the Terms of Use that was in effect when Plaintiff enrolled in CreditWorks is attached as Exhibit 6 to the Smith Declaration. After enrolling, Plaintiff continuously used the service, including after the version of the Terms of Use in effect at the time she filed this lawsuit came into effect. *Id*. A true and correct copy of the Terms of Use that was in effect at the time that Plaintiff filed this lawsuit is attached as Exhibit 3 to the Smith Declaration.

Every version of the Terms of Use that was in effect during Plaintiff's enrollment contains an Arbitration Agreement, which requires her to litigate, among other things, all claims against "ECS" that "relate to" or "arise out of" her agreement in arbitration. *Id*., ¶ 11. The Arbitration Agreement and "Overview and Acceptance of Terms" section of the contract defines "ECS" to include its "affiliates." *Id*. During the entire time that Plaintiff has been enrolled, EIS has been an affiliate of ECS. *Id*. By including EIS (an affiliate) within the definition of "ECS," the Terms of Use make EIS a party to the contract, as well as a party to the Arbitration Agreement contained within that contract. *Id*. Moreover, by including EIS within the "Overview and Acceptance of Terms" section, as well as within the definition of ECS in the Arbitration Agreement, the parties intended for EIS to benefit under the contract. *Id*. Additionally, the Arbitration Agreement expressly incorporates the AAA rules. *Id*.

Every version of the Terms of Use Agreement in effect during Plaintiff's enrollment has a section entitled, "Amendments," which advised her that she would be bound by the then-current Terms of Use each time she "order[ed], access[ed], or use[d]" any of the Services or Websites described in the agreement: "Each time you order, access or use any of the Services or Websites,

you signify your acceptance and agreement, without limitation or qualification, to be bound by the then current Agreement." *Id.*, ¶ 12. ECS provided Plaintiff with written e-mail notice of the Arbitration Agreement in the current version of the Terms of Use, and thereafter, Plaintiff continued to use the CreditWorks service, thereby accepting the amended Terms of Use in the manner called out in the contract. *Id*.

## III. FACTS PERTAINING TO STEPHEN BILODEAU'S MEMBERSHIP

On March 24, 2019, Plaintiff enrolled in CreditWorks. *See* Smith Decl., ¶ 13. In order to successfully enroll, Plaintiff had to complete two webforms. *Id*. The first form required Plaintiff to enter his personal information—*e.g.*, his name, address, phone number, and e-mail address. *Id*. After he did so, Plaintiff had to click the "Submit and Continue" button on the form to continue with the enrollment process. *Id*. A true and correct representation of the first webform as it would have appeared when Plaintiff enrolled in CreditWorks is attached as Exhibit 7 to the Smith Declaration. *Id*. Plaintiff clicked the "Submit and Continue" button and was presented with a second form to complete. *Id.* Plaintiff would not have been able to successfully enroll in CreditWorks unless he clicked that button. *Id*.

The second webform required Plaintiff to enter his social security number, date of birth, and a username and password. *Id.* Immediately below the boxes to enter and confirm his password, was the following disclosure: "By clicking "Submit Secure Order": I accept and agree to your Terms of Use Agreement, as well as acknowledge receipt of your Privacy Policy and Ad Targeting Policy." *Id*. A true and correct representation of the webform as it would have appeared when Plaintiff enrolled in CreditWorks is attached as Exhibit 8 to the Smith Declaration. *Id*.

The phrase "**Terms of Use Agreement**" in the disclosure above was off set in bold blue text and, if clicked, would have presented the consumer with the full text of the agreement. *Id.*,

¶ 14. That is, the phrase "Terms of Use Agreement" in the disclosure was a full text hyperlink to the Terms of Use. *Id*. Thus, before clicking the "Submit Secure Order" button, the consumer could view the entire text of the Terms of Use Agreement by clicking on the blue-highlighted hyperlink "Terms of Use Agreement." *Id*. When a consumer clicked on the "Terms of Use Agreement" hyperlink, an overlay modal would open within the consumer's web browser containing the entire text of the Terms of Use Agreement. *Id*. Immediately below the disclosure was a large purple button that reads: "Submit Secure Order." *Id*. The webform, the disclosure, and the "Submit Secure Order" button appeared on a single webpage. *Id*.

After entering his information, Plaintiff clicked the "Submit Secure Order" button, thereby accepting and agreeing to the Terms of Use Agreement. *Id*., ¶ 15. Plaintiff would not have been able to successfully enroll in CreditWorks unless he clicked that button. *Id*. A true and correct copy of the Terms of Use that was in effect when Plaintiff enrolled in CreditWorks is attached as Exhibit 9 to the Smith Declaration. After enrolling, Plaintiff continuously used the service until April 19, 2024, when he cancelled his CreditWorks membership. *Id*. A true and correct copy of the Terms of Use in effect at the time Plaintiff cancelled his membership is attached as Exhibit 10 to the Smith Declaration.

Every version of the Terms of Use that was in effect during Plaintiff's enrollment contains an Arbitration Agreement, which requires him to litigate, among other things, all claims against "ECS" that "relate to" or "arise out of" his agreement in arbitration. *Id*., ¶ 16. The Arbitration Agreement and "Overview and Acceptance of Terms" section of the contract defines "ECS" to include its "affiliates." *Id*. During the entire time that Plaintiff has been enrolled, EIS has been an affiliate of ECS. *Id*. By including EIS (an affiliate) within the definition of "ECS," the Terms of Use make EIS a party to the contract, as well as a party to the Arbitration Agreement contained

within that contract. *Id*. Additionally, the Arbitration Agreement expressly incorporates the AAA rules. *Id*.

Every version of the Terms of Use Agreement in effect during Plaintiff's enrollment has a section entitled, "Amendments," which advised him that he would be bound by the then-current Terms of Use each time he "order[ed], access[ed], or use[d]" any of the Services or Websites described in the agreement: "Each time you order, access or use any of the Services or Websites, you signify your acceptance and agreement, without limitation or qualification, to be bound by the then current Agreement." *Id*., ¶ 17. ECS provided Plaintiff with written e-mail notice of the Arbitration Agreement in the current version of the Terms of Use, and thereafter, Plaintiff continued to use the CreditWorks service, thereby accepting the amended Terms of Use in the manner called out in the contract. *Id*.

## IV. FACTS PERTAINING TO RAYMOND SMITH'S MEMBERSHIP

On February 27, 2021, Plaintiff enrolled in CreditWorks. *See* Smith Decl., ¶ 18. In order to successfully enroll, Plaintiff had to complete a single webform. *Id*. The form required Plaintiff to enter his personal information—*e.g.*, his name, address, phone number, and e-mail address—and create a password. *Id*. After he entered his personal information and a password, Plaintiff had to click the "Create Your Account" button on the webform in order to enroll. *Id*. Below the boxes to enter his e-mail address and password was the following disclosure: "By clicking 'Create Your Account': I accept and agree to your Terms of Use Agreement, as well as acknowledge receipt of your Privacy Policy." *Id*. A true and correct representation of the webform as it would have appeared when Plaintiff enrolled in CreditWorks is attached as Exhibit 11 to the Smith Declaration.

The phrase "**Terms of Use Agreement**" in the disclosure was off set in bold blue text and, if clicked, would have presented the consumer with the full text of the agreement. *Id*., ¶ 19. That is,

the phrase "Terms of Use Agreement" in the disclosure was a full text hyperlink to the Terms of Use. *Id*. Thus, before clicking the "Create Your Account" button, the consumer could view the entire text of the Terms of Use Agreement by clicking on the blue-highlighted hyperlink "Terms of Use Agreement." *Id*. When a consumer clicked on the "Terms of Use Agreement" hyperlink, an overlay modal would open within the consumer's web browser containing the entire text of the Terms of Use Agreement. *Id*. Below the disclosure was a large purple button that read: "Create Your Account." *Id*. The webform, the disclosure, and the "Create Your Account" button appeared on a single webpage. *Id*.

After entering his information, Plaintiff clicked the "Submit Secure Order" button, thereby accepting and agreeing to the Terms of Use Agreement. *Id*., ¶ 20. Plaintiff would not have been able to successfully enroll in CreditWorks unless he clicked that button. *Id*. A true and correct copy of the Terms of Use that was in effect when Plaintiff enrolled in CreditWorks is attached as Exhibit 12 to the Smith Declaration. After enrolling, Plaintiff continuously used the service until May 20, 2025, when he cancelled his CreditWorks membership. *Id*. A true and correct copy of the Terms of Use in effect at the time Plaintiff cancelled his membership is attached as Exhibit 3 to this Declaration.

Terms of Use contains an Arbitration Agreement, which requires him to arbitrate, among other things, all claims against "ECS" that "relate to" or "arise out of" his membership. *Id*., ¶ 21. The Arbitration Agreement defines "ECS" to include its "affiliates." *Id*. During the entire time that Plaintiff has been enrolled in CreditWorks, EIS has been an affiliate of ECS. *Id*. By including EIS (an affiliate) within the definition of "ECS," the Terms of Use make EIS a party to the contract, as well as a party to the Arbitration Agreement contained within the contract. *Id*. Moreover, by including EIS within the "Overview and Acceptance of Terms" section, as well as within the

definition of ECS in the Arbitration Agreement, the parties intended for EIS to benefit under the contract. Additionally, the Arbitration Agreement incorporates the AAA rules. *Id.*

Every version of the Terms of Use Agreement in effect during Plaintiff's enrollment has a section entitled, "Amendments," which advised him that he would be bound by the then-current Terms of Use each time he "order[ed], access[ed], or use[d]" any of the Services or Websites described in the agreement: "Each time you order, access or use any of the Services or Websites, you signify your acceptance and agreement, without limitation or qualification, to be bound by the then current Agreement." *Id.*, ¶ 22. ECS provided Plaintiff with written e-mail notice of the Arbitration Agreement in the current version of the Terms of Use, and thereafter, Plaintiff continued to use the CreditWorks service, thereby accepting the amended Terms of Use in the manner called out in the contract. *Id.*

## V. <u>FACTS PERTAINING TO WILTON WAHLKAMP'S MEMBERSHIP</u>

On July 26, 2021, Plaintiff enrolled in CreditWorks. *See* Smith Decl., ¶ 23. In order to successfully enroll, Plaintiff had to complete a single webform. *Id.* The form required Plaintiff to enter his personal information—*e.g.*, his name, address, phone number, and e-mail address—and create a password. *Id.* After he entered his personal information and a password, Plaintiff had to click the "Create Your Account" button on the webform in order to enroll. *Id.* Below the boxes to enter his e-mail address and password was the following disclosure: "By clicking 'Create Your Account': I accept and agree to your Terms of Use Agreement, as well as acknowledge receipt of your Privacy Policy." *Id.* A true and correct representation of the webform as it would have appeared when Plaintiff enrolled in CreditWorks is attached as Exhibit 11 to the Smith Declaration.

The phrase "**Terms of Use Agreement**" in the disclosure was off set in bold blue text and, if clicked, would have presented the consumer with the full text of the agreement. *Id.*, ¶ 24. That is,

the phrase "Terms of Use Agreement" in the disclosure was a full text hyperlink to the Terms of Use. *Id*. Thus, before clicking the "Create Your Account" button, the consumer could view the entire text of the Terms of Use Agreement by clicking on the blue-highlighted hyperlink "Terms of Use Agreement." *Id*. When a consumer clicked on the "Terms of Use Agreement" hyperlink, an overlay modal would open within the consumer's web browser containing the entire text of the Terms of Use Agreement. *Id*. Below the disclosure was a large purple button that read: "Create Your Account." *Id*. The webform, the disclosure, and the "Create Your Account" button appeared on a single webpage. *Id*.

After entering his information, Plaintiff clicked the "Submit Secure Order" button, thereby accepting and agreeing to the Terms of Use Agreement. *Id*., ¶ 25. Plaintiff would not have been able to successfully enroll in CreditWorks unless he clicked that button. *Id*. A true and correct copy of the Terms of Use that was in effect when Plaintiff enrolled in CreditWorks is attached as Exhibit 12 to the Smith Declaration. After enrolling, Plaintiff continuously used the service until May 21, 2025, when he cancelled his CreditWorks membership. *Id*. A true and correct copy of the Terms of Use in effect at the time Plaintiff cancelled his membership is attached as Exhibit 3 to this Declaration.

Terms of Use contains an Arbitration Agreement, which requires him to arbitrate, among other things, all claims against "ECS" that "relate to" or "arise out of" his membership. *Id*., ¶ 26. The Arbitration Agreement defines "ECS" to include its "affiliates" *Id*. During the entire time that Plaintiff has been enrolled in CreditWorks, EIS has been an affiliate of ECS. *Id*. By including EIS (an affiliate) within the definition of "ECS," the Terms of Use make EIS a party to the contract, as well as a party to the Arbitration Agreement contained within the contract. *Id*. Moreover, by including EIS within the "Overview and Acceptance of Terms" section, as well as within the

definition of ECS in the Arbitration Agreement, the parties intended for EIS to benefit under the contract. Additionally, the Arbitration Agreement incorporates the AAA rules. *Id.*

Every version of the Terms of Use Agreement in effect during Plaintiff's enrollment has a section entitled, "Amendments," which advised him that he would be bound by the then-current Terms of Use each time he "order[ed], access[ed], or use[d]" any of the Services or Websites described in the agreement: "Each time you order, access or use any of the Services or Websites, you signify your acceptance and agreement, without limitation or qualification, to be bound by the then current Agreement." *Id.*, ¶ 27. ECS provided Plaintiff with written e-mail notice of the Arbitration Agreement in the current version of the Terms of Use, and thereafter, Plaintiff continued to use the CreditWorks service, thereby accepting the amended Terms of Use in the manner called out in the contract. *Id.*

## VI. <u>FACTS PERTAINING TO SUSAN HUDSPETH'S MEMBERSHIP</u>

On July 21, 2025, Plaintiff enrolled in CreditWorks. *See* Smith Decl., ¶ 28. In order to successfully enroll, Plaintiff had to complete a single webform. *Id.* The form required Plaintiff to enter her personal information—*e.g.*, her name, address, phone number, and e-mail address—and create a password. *Id.* After she entered her personal information and a password, Plaintiff had to click the "Create Your Account" button on the webform in order to enroll. *Id.* Below the boxes to enter her e-mail address and password was the following disclosure: "By clicking 'Create Your Account': I accept and agree to your Terms of Use Agreement, as well as acknowledge receipt of your Privacy Policy." *Id.* A true and correct representation of the webform as it would have appeared when Plaintiff enrolled in CreditWorks is attached as Exhibit 13 to the Smith Declaration.

The phrase "**Terms of Use Agreement**" in the disclosure was off set in bold blue text and, if clicked, would have presented the consumer with the full text of the agreement. *Id.*, ¶ 29. That is,

the phrase "Terms of Use Agreement" in the disclosure was a full text hyperlink to the Terms of Use. *Id*. Thus, before clicking the "Create Your Account" button, the consumer could view the entire text of the Terms of Use Agreement by clicking on the blue-highlighted hyperlink "Terms of Use Agreement." *Id*. When a consumer clicked on the "Terms of Use Agreement" hyperlink, an overlay modal would open within the consumer's web browser containing the entire text of the Terms of Use Agreement. *Id*. Below the disclosure was a large purple button that read: "Create Your Account." *Id*. The webform, the disclosure, and the "Create Your Account" button appeared on a single webpage. *Id*.

After entering her information, Plaintiff clicked the "Submit Secure Order" button, thereby accepting and agreeing to the Terms of Use Agreement. *Id*., ¶ 30. Plaintiff would not have been able to successfully enroll in CreditWorks unless she clicked that button. *Id*. A true and correct copy of the Terms of Use that was in effect when Plaintiff enrolled in CreditWorks is attached as Exhibit 3 to the Smith Declaration.

Terms of Use contains an Arbitration Agreement, which requires her to arbitrate, among other things, all claims against "ECS" that "relate to" or "arise out of" her membership. *Id*., ¶ 31. The Arbitration Agreement defines "ECS" to include its "affiliates." *Id*. During the entire time that Plaintiff has been enrolled in CreditWorks, EIS has been an affiliate of ECS. *Id*. By including EIS (an affiliate) within the definition of "ECS," the Terms of Use make EIS a party to the contract, as well as a party to the Arbitration Agreement contained within the contract. *Id*. Moreover, by including EIS within the "Overview and Acceptance of Terms" section, as well as within the definition of ECS in the Arbitration Agreement, the parties intended for EIS to benefit under the contract. Additionally, the Arbitration Agreement incorporates the AAA rules. *Id*.

## VII. FACTS PERTAINING TO JASON SETTLE'S MEMBERSHIP

On July 5, 2023, Plaintiff enrolled in CreditWorks. *See* Smith Decl., ¶ 32. In order to successfully enroll, Plaintiff had to complete a single webform. *Id*. The form required Plaintiff to enter his personal information—*e.g.*, his name, address, phone number, and e-mail address—and create a password. *Id*. After he entered his personal information and a password, Plaintiff had to click the "Create Your Account" button on the webform in order to enroll. *Id*. Below the boxes to enter his e-mail address and password was the following disclosure: "By clicking 'Create Your Account': I accept and agree to your Terms of Use Agreement, as well as acknowledge receipt of your Privacy Policy." *Id*. A true and correct representation of the webform as it would have appeared when Plaintiff enrolled in CreditWorks is attached as Exhibit 14 to the Smith Declaration.

The phrase "**Terms of Use Agreement**" in the disclosure was off set in bold blue text and, if clicked, would have presented the consumer with the full text of the agreement. *Id*., ¶ 33. That is, the phrase "Terms of Use Agreement" in the disclosure was a full text hyperlink to the Terms of Use. *Id*. Thus, before clicking the "Create Your Account" button, the consumer could view the entire text of the Terms of Use Agreement by clicking on the blue-highlighted hyperlink "Terms of Use Agreement." *Id*. When a consumer clicked on the "Terms of Use Agreement" hyperlink, an overlay modal would open within the consumer's web browser containing the entire text of the Terms of Use Agreement. *Id*. Below the disclosure was a large purple button that read: "Create Your Account." *Id*. The webform, the disclosure, and the "Create Your Account" button appeared on a single webpage. *Id*.

After entering his information, Plaintiff clicked the "Submit Secure Order" button, thereby accepting and agreeing to the Terms of Use Agreement. *Id*., ¶ 34. Plaintiff would not have been able to successfully enroll in CreditWorks unless he clicked that button. *Id*. A true and correct

copy of the Terms of Use that was in effect when Plaintiff enrolled in CreditWorks is attached as Exhibit 15 to the Smith Declaration.

Terms of Use contains an Arbitration Agreement, which requires him to arbitrate, among other things, all claims against "ECS" that "relate to" or "arise out of" his membership. *Id.*, ¶ 35. The Arbitration Agreement defines "ECS" to include its "affiliates" Id. During the entire time that Plaintiff has been enrolled in CreditWorks, EIS has been an affiliate of ECS. *Id*. By including EIS (an affiliate) within the definition of "ECS," the Terms of Use make EIS a party to the contract, as well as a party to the Arbitration Agreement contained within the contract. *Id*. Moreover, by including EIS within the "Overview and Acceptance of Terms" section, as well as within the definition of ECS in the Arbitration Agreement, the parties intended for EIS to benefit under the contract. Additionally, the Arbitration Agreement incorporates the AAA rules. *Id.*

## LEGAL ARGUMENT

### I. THE COURT SHOULD COMPEL THIS MATTER TO ARBITRATION

Section 2 of the FAA mandates that binding arbitration agreements in contracts "evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This provision "reflect[s] both a 'liberal federal policy favoring arbitration' and the 'fundamental principle that arbitration is a matter of contract,'" such that "courts must place arbitration agreements on an equal footing with other contracts and enforce them according to their terms." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011); *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006).

Pursuant to the FAA, arbitration must be compelled where, as here: (1) the parties have entered into a valid agreement to arbitrate, and (2) the dispute at issue comes within the scope of

the arbitration agreement. *See Muriithi v. Shuttle Express, Inc.*, 712 F.3d 173, 179 (4th Cir. 2013) (citation omitted). An arbitration agreement governed by the FAA, like the arbitration agreement here, is presumed to be valid and enforceable. *Shearson/Am. Express v. McMahon*, 482 U.S. 220, 226 (1987). There is a presumption in favor of arbitrability, *AT&T Tech, Inc. v. Communications Workers of America*, 475 U.S. 643, 650 (1986), and the party seeking to evade arbitration bears the burden of showing that the arbitration provision is invalid or does not encompass the claims at issue. *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 92 (2000).

As demonstrated below, the arbitration agreement in the Terms of Use Agreement is valid, and to the extent that there is a dispute over the arbitrability of Plaintiffs' claims, such questions have been delegated to an arbitrator to decide.

### A. A Valid Agreement to Arbitrate Exists

State contract formation law determines the validity of arbitration agreements. *Hill v. Peoplesoft USA, Inc.*, 412 F.3d 540 (4th Cir. 2005); *Johnson v. Circuit City Stores, Inc.*, 148 F.3d 373, 377 (4th Cir. 1998). The public policy of Virginia favors arbitration. *TM Delmarva Power, L.L.C. v. NCP of Va., L.L.C.*, 263 Va. 116, 122–23, 557 S.E.2d 199, 202 (2002). Under Virginia law, "[t]he law of contracts governs the question whether there exists a valid and enforceable agreement to arbitrate." *Mission Residential, L.L.C. v. Triple Net Properties, L.L.C.*, 275 Va. 157, 160, 654 S.E.2d 888 (2008).[1]

Courts within this Circuit—including, most recently, the Fourth Circuit in *Austin*—routinely enforce internet agreements where the user is required to affirmatively acknowledge the agreement before proceeding with use of the website. *See Austin*, 148 F.4th 194, 205-209;

[1] Plaintiffs Hudspeth and Settle are residents of North Carolina and Illinois, respectively. The law regarding contract formation in those states is not materially different than it is in Virginia.

*see also Hosseini v. Upstart Network, Inc.*, Civil Case No. 19-cv-704, 2020 WL 573126 (E.D. Va. Feb. 5, 2020) (Ellis, J.) ("Modified or hybrid clickwrap agreements, where the user must affirmatively manifest assent to agreements that are provided via hyperlink, are also routinely found to be valid, enforceable contracts."); *Melo v. Zumper, Inc.*, 439 F. Supp. 3d 683, 697 (E.D. Va. 2020) (Novak, J.) (finding enforceable contract under Virginia law, and noting that "courts have consistently 'recognized that [an] electronic "click" can suffice to signify the acceptance of a contract,' and that '[t]here is nothing automatically offensive about such agreements, as long as the layout and language of the site give the user reasonable notice that a click will manifest assent to an agreement'") (quoting *Meyer v. Uber Technologies, Inc.*, 868 F.3d 66, 75 (2d Cir. 2017) (quoting *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1033–34 (7th Cir. 2016))); *Lee v. Ticketmaster, LLC*, 2019 WL 9096442, at *1 (N.D. Cal. April 1, 2019) ("Ticketmaster provided notice of the terms of use adjacent to the 'Place Order' button, included a hyperlink to the terms in a contrasting color, and informed the user that 'continuing past this page' (*i.e.*, placing an order) would indicate assent to the terms.").

As a matter of law, Plaintiffs agreed to the Terms of Use because: (1) they had clear notice of the Terms of Use at the time they enrolled, (2) they were admonished that, by clicking an adjacent button, they were agreeing to be bound by the Terms of Use; and (3) they clicked the button, thereby manifesting their assent to the Terms of Use. Courts throughout the country to construe the CreditWorks signup process, including the Fourth Circuit in *Austin*, have concluded that design and layout of the website placed users on notice that they were agreeing to be bound by the Terms of Use. *See Austin*, 148 F.4th 194, 205-209; *Levy*, 2023 WL 2644352, at *7 ("Plaintiff was provided with reasonably conspicuous notice of the arbitration agreement in the 2019 TOU."); *Cimillo*, 2023 WL 2473403, at *5-7 ("The Court finds that the undisputed facts

indicate the webpage design presented, and the language used in the July 2019 TOU, clearly and conspicuously communicated the terms of the Arbitration Agreement to plaintiff, and that plaintiff affirmatively indicated she agreed to them."); *Tadic*, 2019 WL 11499103, at *2 ("The Plaintiff is bound by the Terms and Conditions, including the agreement obligating her to arbitrate on an individual basis, her claims against ConsumerInfo.com, Inc. or its parent and affiliated entities. The Plaintiff's act of clicking on the SUBMIT SECURE ORDER button signified her acceptance of the Terms and Conditions."); *DeVries*, 2017 WL 733096, at *6 ("The text containing the Terms and Conditions hyperlink was located directly above that button and indicated that clicking "Submit Secure Purchase" constituted acceptance of those terms'"). This Court should follow this well-worn path.

**B. <u>EIS May Directly Enforce The Arbitration Agreement</u>**

EIS's status as a party to the Arbitration Agreement in the CreditWorks Terms of Use is well-recognized. Every court to consider the issue has so concluded. *See Levy*, 2023 WL 2644352, at *6-7 ("[T]he Court agrees with Defendant [EIS] that it is an affiliate of ECS and a party to the contract."); *Meeks*, 2022 WL 17958634, at *2 ("Because the district court's denial of the motion to compel arbitration was the result of a legal error and the record is sufficiently developed to allow us to do so, we hold that [EIS] is a party to the arbitration provision."); *Alvarez*, 2023 WL 2519249, at *6 ("There is no reasonable basis to find that Plaintiff has not assented to arbitration with [EIS]."); *Roberson*, 2022 WL 62270, at *2 (same).

These holdings comport with the language of the contract. The "Overview and Acceptance of Terms" section defines ECS to include its affiliates, such as EIS. The Arbitration Agreement contained within the Terms of Use does the same. *Id*. Indeed, it includes a straightforward, bilateral promise: "ECS and you agree to arbitrate all disputes and claims

between us that arise out of or relate to this Agreement . . . ." And the Arbitration Agreement clearly defines ECS to include it "parent entities, subsidiaries, [and] affiliates." As an affiliate of ECS, EIS is swept within the definitions of "ECS" and "us" under the Arbitration Agreement and thus qualifies as a promisee (and promisor) entitled to enforce the Arbitration Agreement that Plaintiff entered. *See Levy*, 2023 WL 2644352, at *6-7; *Meeks*, 2022 WL 17958634, at *2; *Alvarez*, 2023 WL 2519249, at *6; *Roberson*, 2022 WL 62270, at *2. Courts routinely have held that materially identical language creates a binding contract enforceable by the parties identified as making promises with each other. *See Mey v. DIRECTV, LLC*, 971 F.3d 284, 287-91 (4th Cir. 2020) (holding that because DIRECTV is an "affiliate" of AT&T under the "plain meaning of the term"—*i.e.*, entities that share "common ownership or control"—plaintiff "formed an agreement to arbitrate with DIRECTV").

In short, by disclosing to users they are agreeing to arbitrate with ECS's affiliates and requiring affirmative action by Plaintiffs to assent to those terms, Plaintiffs are bound by the Terms of Use and its obligation that they arbitrate their claims against EIS.

### C. <u>At A Minimum, However, EIS Is A Third-Party Beneficiary</u>

In the alternative, EIS may compel arbitration as a third-party beneficiary.

#### 1. <u>Whether EIS Is A Third-Party Beneficiary Has Been Delegated To An Arbitrator To Decide</u>

If there is any dispute over whether EIS qualifies as a third-party beneficiary, that issue is to be resolved by an arbitrator. By default, the parties to an arbitration agreement are presumed to have left such questions of arbitrability to the courts. *See, e.g.*, *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). They may alter this background rule, however, by agreeing to send questions of arbitrability to an arbitrator along with the rest of the underlying dispute. Where the contract "clearly and unmistakably" does so, a court must enforce this distinct

agreement by compelling disputes about arbitrability into arbitration. *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986).

"[W]hen ... parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator." *Henry Schein Inc. v. Archer & White Sales Inc.*, —— U.S. ——, 139 S. Ct. 524, 529, 202 L.Ed.2d 480 (2019). Here, not only does the Terms of Use expressly delegate "all issues" to an arbitrator, but the contract incorporates the AAA rules. Accordingly, courts consistently have found that a "dispute over whether Experian is a third-party beneficiary should go to the arbitrator." *See, e.g.*, *Sauer*, 2022 WL 2163016, at *2 (whether EIS is a third-party beneficiary under the CreditWorks Terms of Use is for an arbitrator to resolve); *Solis*, 2022 WL 2163016, at *1-2 ("Plaintiff agreed that 'the arbitrator shall have exclusive authority to resolve any such dispute relating to the scope and enforceability of this arbitration provision or any other term of this Agreement.'").

These holdings are consistent with circuit court precedent. *See Eckert/Wordell Architects, Inc. v. FJM Props. of Willmar, LLC*, 756 F.3d 1098, 1100 (8th Cir. 2014) (sending the question of "[w]hether a particular arbitration provision may be used to compel arbitration between a signatory and a non-signatory" to the arbitrator because the arbitration agreement incorporated the AAA Rules); *Portland General Electric Co. v. Liberty Mutual Insurance Co.*, 862 F.3d 981, 983–84 (9th Cir. 2017) (same); *Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842, 843–44, 852 (6th Cir. 2020) (same). Accordingly, an arbitrator must resolve any doubts about EIS's ability to compel arbitration as a third-party beneficiary. *Sauer*, 2022 WL 2163016, at *1-2.

**2. <u>Even If This Court Were To Decide The Question, EIS Plainly Is A Third-Party Beneficiary</u>**

"A non-signatory may invoke an arbitration clause under ordinary state-law principles of

agency or contract." *Long v. Silver*, 248 F.3d 309, 320 (4th Cir. 2001), overruled on other grounds, *Hertz Corp. v. Friend*, 559 U.S. 77, 86, 130 S.Ct. 1181, 1190–92, 175 L.Ed.2d 1029 (2010). Virginia, like most other jurisdictions, has recognized the doctrine of third-party beneficiary. Under Virginia law, a third-party beneficiary is an intended third-party beneficiary if it can "show by the evidence that the parties to the contract clearly and definitely intended to confer a direct benefit upon [the third party]." *Kelley v. Griffin*, 252 Va. 26, 471 S.E.2d 475, 477 (1996) (citations omitted). As further explained by the Virginia Supreme Court, "[t]he essence of a third-party beneficiary's claim is that others have agreed between themselves to bestow a benefit upon the third party. . .." *Copenhaver v. Rogers*, 238 Va. 361, 384 S.E.2d 593, 596 (1989).

The Fourth Circuit and other courts repeatedly have held that a third party named in a contract, either directly or as a member of a specified class, can enforce arbitration provisions. *Mey*, 971 F.3d at 291; *Bakon v. Rushmore Serv. Ctr., LLC*, 2017 WL 2414639, at *3 (E.D.N.Y. June 2, 2017) (holding that non-signatory could enforce arbitration agreement as an affiliate of a signatory because the "agreement identifies a class of parties who are covered by the Agreement in addition to the bank and cardholder, namely the 'employees, parents, subsidiaries, affiliates, beneficiaries, agents and assigns of you and us'" and therefore the affiliate "as a member of this class, was intended as a third party beneficiary who may enforce the Agreement").

Under this authority, EIS—which is an "affiliate" defined as part of "ECS" for purposes of the Arbitration Agreement—qualifies as a third-party beneficiary entitled to enforce the Arbitration Agreement. By defining "ECS" to include its affiliates (like EIS), EIS clearly is a party who was intended to benefit from the contract, including by arbitrating claims against it pursuant to the contract's express provisions guaranteeing that outcome. *Hacohen v. BMW of North America, LLC*, Case No. CV 21-0464-MWF, 2021 WL 4352364, at *5 (C.D. Cal. July 23, 2021) (explaining

that an arbitration agreement allowing enforcement by affiliates meets this standard). EIS may compel arbitration as a third-party beneficiary. *Alvarez*, 2023 WL 2519249, at *6 ("Even if [EIS] could not enforce the Arbitration Agreement as a party, under a third-party beneficiary theory, [EIS] may do so.").

### D. <u>Any Dispute Over The Arbitrability Of Plaintiffs' Claims Has Been Delegated To An Arbitrator To Resolve</u>

If there is any dispute over whether Plaintiff's claims fall within the scope of the Arbitration Agreement, that issue also is to be decided by an arbitrator: "All issues are for the arbitrator to decide . . .. "When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract." *Henry Schein*, 139 S.Ct. at 527–30; *Coulter*, 2021 WL 735726 at *4 (finding that the Terms of Use's delegation clause "constitutes a 'clear and unmistakable' delegation clause under *Henry Schein* and delegates the exclusive authority to resolve 'all issues' to the arbitrator, including the 'scope and enforceability' of the Arbitration Provision"); *Stephens*, 2022 WL 2716177, at *6 (same).

## II. <u>THE ACTION SHOULD BE STAYED PENDING ARBITRATION</u>

Section 3 of the FAA expressly provides that a district court "shall . . . stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3; *Smith v. Spizzirri*, 144 S.Ct. 1173, 1175 (2024) ("The question here is whether § 3 permits a court to dismiss the case instead of issuing a stay when the dispute is subject to arbitration and a party requests a stay pending arbitration. It does not.").

## <u>CONCLUSION</u>

For the foregoing reasons, EIS respectfully requests that the Court grant this Motion, enter an order directing Plaintiffs to arbitrate their claims against EIS, and stay this action pending the completion of arbitration.

Dated: December 10, 2025

Respectfully submitted,

*/s/ David N. Anthony*

David N. Anthony
Virginia State Bar No. 31696
H. Scott Kelly
Virginia State Bar No. 80546
*Counsel for Experian Information Solutions, Inc.*
TROUTMAN PEPPER LOCKE LLP
1001 Haxall Point
Richmond, VA 23219
Telephone: (804) 697-5410
Facsimile: (804) 698-5118
Email: david.anthony@troutman.com
Email: scott.kelly@troutman.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of December 2025, I cause the foregoing document to be filed with the Clerk of the Court using the CM/ECF system, which will send notice of electronic filing to all counsel of record.

*/s/ David N. Anthony*
David N. Anthony
Virginia State Bar No. 31696
*Counsel for Experian Information Solutions, Inc.*
TROUTMAN PEPPER LOCKE LLP
1001 Haxall Point
Richmond, VA 23219
Telephone: (804) 697-5410
Facsimile: (804) 698-5118
Email: david.anthony@troutman.com